IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TEXASLDPC INC.,

        *Plaintiff,*

      v.

BROADCOM INC.; LSI CORP.; and
AVAGO TECHNOLOGIES U.S. INC.

        *Defendants.*

No. 1:18-cv-01966-SB

---

Gregory Robert Booker, Bret T Winterle, David H. Hoffman, Ethan J. Rubin, Joseph B. Warden, Lawrence K. Kolodney, Michael R. Headley, Rodeen Talebi, Warren K. Mabey, Jr., FISH & RICHARDSON, P.C., Wilmington, Delaware.

        *Counsel for Plaintiff.*

Adam Wyatt Poff, Robert M. Vrana, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, Delaware; Steven J. Rizzi, Ramy E. Hanna, Archis Ozarkar, Ari Rafilson, Laura Baron, Patrick J.D. Griffin, MCKOOL SMITH, Houston, Texas.

        *Counsel for Defendants.*

---

**MEMORANDUM OPINION**

September 29, 2023

BIBAS, *Circuit Judge*, sitting by designation.

To defend Texas A&M's intellectual property, TexasLDPC brought Broadcom and friends to court. But along the way, it lost a legal interest in the case. So this dispute no longer belongs in court.

TexasLDPC's interest was based entirely on its contract with Texas A&M. Without that contract, there is no controversy. But the contract said it would automatically terminate when TexasLDPC "cease[d] its business operations." D.I. 529-1, at 119 § 8.03(a)(iii). And those operations, as understood by the parties at the time of the contract, ceased in 2019. With it, both the contract and controversy ended.

After Broadcom challenged its standing, TexasLDPC reached out to Texas A&M to change the meaning of the doomed contract to resurrect it. But that maneuver failed. Plus, as TexasLDPC tacked away from the Scylla of subject-matter jurisdiction, it ran headlong into the Charybdis of joinder. By involving Texas A&M so intimately in the proceedings, TexasLDPC proved that it is a necessary party in this suit. So I dismiss all federal claims and counterclaims without prejudice for lack of subject matter jurisdiction and failure to join a necessary party.

## I. TexasLDPC's Business Operations Have Shifted to Enforcement

### A. TexasLDPC was founded to develop and license intellectual property

While a doctoral candidate at Texas A&M, Dr. Kiran Gunnam invented a series of (allegedly novel) ways to transmit information over noisy channels. *See, e.g.*, D.I. 247 ¶ 44. Texas A&M patented and licensed this low-density parity check technology. *Id.* ¶ 49; *see* D.I. 529-1, at 895.

After graduating, Dr. Gunnam went to work at LSI Corporation. D.I. 247 ¶ 59. While there, he tried to persuade the company to license his inventions from Texas A&M. *Id.* ¶¶ 61–63. But his efforts were unsuccessful. *Id.* Eventually, he left LSI. *Id.* ¶ 78. In later conversations with members of Texas A&M, he expressed interest in starting a company to further develop and sublicense his invention. Defs. Hr'g Ex. 9.

Around that time, Annapurna Yarlagadda, Dr. Gunnam's wife, cofounded TexasLDPC to do just that. *E.g.*, D.I. 643, Ex. A, at 26 [Hr'g Tr.]. TexasLDPC was founded in 2014 to develop and sublicense the technology. *E.g.*, *id.* at 14–15.

The company got a licensing contract from Texas A&M for those two purposes. The contract gave TexasLDPC the power to enforce its intellectual property rights. *See* D.I. 529-1, at 119 § 8.03(a)(iii). (That power was not unlimited because it did not extend to one preexisting license that Texas A&M had granted to another of Dr. Gunnam's former employers.) *Id.* This contract is the sole legal basis for TexasLDPC's interest in this case. *See, e.g.*, D.I. 247 ¶¶ 43, 50.

## B. TexasLDPC changed its business from developing and licensing intellectual property to enforcing it

After attempting to market and develop the intellectual property for three years, TexasLDPC sued Broadcom in December 2018. *See* D.I. 1. A month later, TexasLDPC amended its complaint to include Broadcom's parent company Avago and its recently-purchased subsidiary LSI, Dr. Gunnam's former employer. *See* D.I. 9. TexasLDPC raised many claims based on Texas A&M's intellectual property, including patent and copyright infringement. *See id.* Broadcom later filed counterclaims. *See* D.I. 67, 375. Along the way, the Court culled some claims but let others continue. *E.g.*, D.I. 325.

Broadcom has repeatedly argued that Texas A&M is a necessary party under Federal Rule of Civil Procedure 19(a). *See, e.g.*, D.I. 44, 118, 529. After all, it owns the intellectual property. But because it enjoys Texas's sovereign immunity, I declined to rule on that issue. D.I. 148, at 4. At the time, I reasoned that no available evidence showed that any party would be prejudiced if the case proceeded without it. *Id.* But I granted leave to renew the motion should something change. D.I. 148, at 3–8.

As discovery came to a close, Broadcom renewed its motion. It also added a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). Broadcom discovered that TexasLDPC had conducted no business since almost the beginning of the case. By summer 2019, the company ran out of money to develop and license the product. *E.g.*, D.I. 529-1, at 169. It had just been suing Broadcom. And it even hired its lawyers on a contingency fee. Hr'g Tr. 21.

Because the licensing contract automatically terminates when TexasLDPC "ceases its business operations," Broadcom now contends that TexasLDPC no longer has standing to bring this claim. D.I. 529-1, at 119 § 8.03(a)(iii). It says the business operations intended in the language of the contract are limited to developing and licensing the intellectual property—functions that TexasLDPC no longer performs. D.I. 529, 562, 627, 643. TexasLDPC counters that enforcement was also part of the business model. D.I. 537, 626, 642. But neither party disputes that TexasLDPC's business model shifted to enforcement no earlier than 2018. *E.g.*, Hr'g Tr. 14–15, 27.

## II. TexasLDPC's New Agreement Does Not Save Its Case

After I held a hearing on the 12(b)(1) question, TexasLDPC submitted a supplemental agreement signed by a Texas A&M representative. The agreement applies

TexasLDPC's preferred reading of the contract. It insists that the term "business operations" has always included enforcement and that the contract has not ended. *See* D.I. 629-1, at 119 § 8.03(a)(iii). The agreement also claims to be retroactive to the time of the original contract's enactment. D.I. 626, Ex. A. In its accompanying letter brief, TexasLDPC asserts that this supplemental agreement cures the jurisdictional defect and prevents the contract from having ended. D.I. 626.

I must decide whether TexasLDPC is right. If the contract is no longer valid, TexasLDPC has lost all legal interest in the case. Parties must "maintain a personal interest in the dispute" for the duration of the case. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). If the plaintiff loses all legal ties to its interest in a case, a federal court lacks jurisdiction and must dismiss the case. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022).

## A. Third Circuit precedent means that this case is properly resolved as a motion to dismiss

While Federal Circuit law governs patent specific matters, *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 693 (Fed. Cir. 2001), the Federal Circuit looks to local circuit law to govern civil procedure and copyright. *Id.*; *Jacobsen v. Katzer*, 535 F.3d 1373, 1377–78 (Fed. Cir. 2008). The current motion is a factual motion to dismiss for lack of subject-matter jurisdiction. *See In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). So the Court can find facts to ensure that it has jurisdiction over the claim. *Robinson v. Dalton*, 107 F.3d 1018, 1021 (3d Cir. 1997).

As TexasLDPC has pointed out, I would have to convert a 12(b)(6) motion to a summary-judgment motion if it were argued on facts from discovery. D.I. 537, at 19–20. But Broadcom properly brings its challenge to TexasLDPC's continued interest in the intellectual property as a 12(b)(1) motion. And it properly raises TexasLDPC's failure to join a necessary party as a 12(b)(7) motion. Neither motion converts to a summary-judgment motion. *See* FED. R. CIV. P. 12(d). So I proceed.

## B. TexasLDPC could sue only because of its licensing contract

Standing is a constitutional requirement that ensures there is a justiciable case or controversy. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). For parties to have standing, there must be a legally recognized injury in fact to the plaintiff, traceable to the defendant, and redressable by the court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Usually, the plaintiff is the one who is injured. But an injured party can assign a right to sue based on that injury to another. *AsymmetRx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314, 1318–19 (Fed. Cir. 2009). That is what happened here. When it filed the complaint, TexasLDPC had Article III standing based on its contract with Texas A&M.

But the plaintiff must retain some interest in the suit for its duration. *See Uzuegbunam*, 141 S. Ct. at 796; *In re Boy Scouts of Am.*, 35 F.4th 149, 156 (3d Cir. 2022). Otherwise, the case is moot. Courts have recognized some exceptions to this rule. A case may continue when a defendant artfully acts to avoid the court's jurisdiction, but the threat of future injury to the plaintiff remains. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190–91 (2000).

Even when a court maintains a suit that loses and regains statutory standing, Article III standing must remain throughout. *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203–04 (3d Cir. 2005). If one of the parties loses all legal interest in a case, the court must dismiss the case. *Moore v. Harper*, 143 S. Ct. 2065, 2076–79 (2023).

### C. TexasLDPC's licensing contract terminated automatically

The facts required to determine jurisdiction all depend on interpreting the contract. That hinges on the intent of the parties at the time of the contract. The parties agree on this point. Hr'g Tr. 107, 113. Texas law governs the contract's interpretation due to a contractual choice-of-law provision. *See* D.I. 529-1, at 122 § 12.09.

In Texas, external evidence is inadmissible only when "the contract language is not fairly susceptible to more than one legal meaning or construction." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 484 (Tex. 2019) (cleaned up). In deciding whether the contract's language is ambiguous, courts are limited to the four corners of the contract. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). But once a court finds it ambiguous, a factfinder can look beyond the four corners "to give the words of a contract a meaning consistent with that to which they are reasonably susceptible." *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995) (per curiam).

Texas law also lets courts look at the parties' course of dealing or course of performance in interpreting a contract, but only to supplement the contract's express terms, not to contradict them. *See* Tex. Bus. & Com. Code Ann. § 1.303 (West 2023). The bar is relatively high for implying meaning from a course of dealings, let alone a course

of performance. *Tubelite v. Risica & Sons, Inc.*, 819 S.W.2d 801 (Tex. 1991). So the contract's language is the best evidence, the contemporary understanding can put a thumb on the scale between plausible readings, and the parties' action immediately after they formed the contract can supplement the other evidence. Here, all point in the same direction: the contract ended automatically.

1. *The contract unambiguously excludes litigation from business operations.* The clear language of the contract shows that TexasLDPC's business operations did not include enforcement. First, under the automatic-termination clause, the contract would end automatically if any one of five situations occurred: bankruptcy, liquidation, assignment, receivership, or if TexasLDPC "cease[d] its business operations." D.I. 529-1, at 119 § 8.03(a). This clause requires no other action from the parties and gives the parties no possibility to cure the termination.

Because the law eschews surplusage, I interpret each item in the list as adding something, even if they sometimes overlap. *See Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). So ceasing its business operations cannot mean bankruptcy proceedings or liquidation.

The plain language of the passage suggests that TexasLDPC will "cease[] its business operations" if it no longer does the things that the contract contemplated it would do. But that depends on what the contract understood TexasLDPC's business operations to be. And to figure that out, I can widen our scope to the rest of the contract. In particular, a "whereas" clause can be an excellent source of insight into the parties'

8

intent in entering a contract. *See Clear Lake City Water Auth. v. Kirby Lake Dev., Ltd.*, 123 S.W.3d 735, 748–49 (Tex. Ct. App. 2003).

Here, there are several whereas clauses. *See* D.I. 529-1, at 112. They refer to Texas A&M's desire to commercialize the intellectual property for the public benefit and welfare. *Id.* And they also expound on TexasLDPC's expertise in commercialization and development. *Id.* But they never mention enforcement.

Plus, the contract lists business operations that TexasLDPC must cease when the contract terminates. But that list mentions only commercial activities, not litigation or enforcement. *Id.* at 119 § 8.04. To be sure, the contract contemplates that Texas-LDPC could sue infringers or enforce the licenses that it grants. *Id.* at 113–14 § 2.01. And it preserves Texas A&M's capacity to receive a share of any resulting litigation profits. *Id.* at 114 § 3.03. But those actions are ancillary. Though TexasLDPC might engage in them, they are not its core business operations. Indeed, earlier in this case, TexasLDPC listed its business only as "design[ing] and market[ing] LDPC solutions." D.I. 31, at 1 n.1.

TexasLDPC argues that another contract provision, § 5.02, proves that enforcement is part of its business model. That clause prevents Texas A&M from voluntarily terminating the agreement when licensing and development are not profitable, but litigation is ongoing. D.I. 537, at 6–7. But nowhere does that section contemplate that TexasLDPC would abandon licensing and development entirely. So this provision does not move the needle.

2. *Outside sources at the time confirm the contract's language.* Even if the meaning of "business operations" were ambiguous, the Court's jurisdictional factfinding would confirm that TexasLDPC's course of performance did not include enforcement at the time of the contract. An internal Texas A&M memo explains only two purposes for TexasLDPC: licensing and development. Defs. Aug. 24, 2023 Hr'g Ex. 9, at 1.

Though the same memo mentions that TexasLDPC could provide revenue to Texas A&M through enforcement payouts, it tacked on that possibility as an added perk. *Id.* Parties on either side have testified that the purpose of the contract was licensing, supporting any licensees they contracted with, and developing the intellectual property. *See* D.I. 529-1, at 132, 577.

TexasLDPC's strongest documentary evidence is a single email from nine months before the contract was finalized. That email listed litigation as the third possible revenue stream in a list of three. Hr'g Ex. 6. But a single email so early in negotiations has limited probative value. And a possible income stream is not the same as a business operation.

At the hearing, Yarlagadda (the founder of TexasLDPC) did her best to support TexasLDPC's position. She described its business model as "sale[s], licensing, and *enforcement*" for the first time in this litigation. Hr'g Tr. 14 (emphasis added). But she conceded that TexasLDPC's business at the time of the contract was development and licensing. Hr'g Tr. 15, 28.

That is how TexasLDPC has presented itself from the start: a licensing and development firm forced to fight back against Broadcom who was bullying it out of the

market. *Cf.* D.I. 31, at 1 n.1. Yarlagadda confirmed that there was a change to the business model around 2019 to add enforcement to its existing operations. Hr'g Tr. 16–17. But then she admitted that all development and licensing ceased around the same time. *Id.* at 16, 22.

That change is fatal to the contract. The business operations at the time of the contract were development and licensing. So when the business model changed to enforcement alone, as Yarlagadda confirmed that it did in 2019, none of the business operations contemplated at the time of the contract remained.

Because the contract ended automatically when TexasLDPC "ceases its business operations," I hold that the licensing contracted ended when TexasLDPC changed its business to just enforcement. This interpretation is supported by all the evidence at the time, the performance of TexasLDPC for the first three years of the contract, and Yarlagadda's testimony. As a result, TexasLDPC lost its legal interest in this case four years ago.

### D. TexasLDPC's attempted cure steers into perilous waters

TexasLDPC's new agreement styles itself as an interpretive document. It makes two claims: the contract remains viable, and the term "business operations" includes litigation. It also purports to be retroactive to the formation of the contract.

But this agreement raises as many issues as it solves. First, under current precedent, does a prudential analysis factor into dismissing a case as moot? For a case to be justiciable, parties must be in dispute "at all stages of review, not merely at the time the complaint is filed." *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (internal quotation marks omitted). To let slide four years without standing, I

would have to conclude that the question of maintaining an interest here is prudential, not a strict bar. Admittedly, there is some precedent for considering sunk costs before dismissing a case as moot. *Laidlaw*, 528 U.S. at 191–92; *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 594–95 (2004); *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 75 (1996).

But in *Laidlaw*, a defendant acted strategically to moot a case, whereas this plaintiff failed to maintain its contract. And the other prudential-standing cases dealt with litigants who had changed the composition of the parties mid-litigation to concoct diversity jurisdiction. In those cases, there was still a forum that could have heard the case, just not an Article III forum. Here, if there is no legal interest, there is no surviving case or controversy at all. So the issue cuts to the heart of this Court's Article III jurisdiction.

Precedent is not to the contrary. True, *Schreiber Foods* suggested that, in the patent context, courts can overlook a loss of an assignee's right to sue without joining the patent's original owner so long as the assignee regains that right before judgment. 402 F.3d at 1203–04. But that case was about a temporary change in the kind of patent rights a party had during the litigation, not a complete loss of any legally recognizable right. And jurisdiction was not raised until after the defect had been repaired, after trial, and before judgment.

Here, once the contract ended, TexasLDPC had no legal interest in the intellectual property at all. This jurisdictional defect existed for years and persisted for

12

months even after TexasLDPC was confronted about it. Only at the eleventh hour did TexasLDPC think to slap a bandage on the gaping wound in its case.

Plus, for a court to retain Article III jurisdiction, the plaintiff must maintain some legal interest for the duration of the case. *See, e.g.*, *Genesis*, 133 S. Ct. at 1528; *Uzuegbunam*, 141 S. Ct. at 796. Given these recent clarifications, mootness caused by completely losing legal interests is likely uncurable. And *Schreiber Foods* appears to be an artifact of antiquated confusion about the difference between statutory and Article III jurisdiction.

TexasLDPC tries to give us a path out of this thorny area of law. It says this agreement is retroactive. So the case was never mooted because the contract never ended. The agreement, it says, can reach into the past, before the contract ended, and prevent its legal death. D.I. 626**,** at 3–5.

A *nunc pro tunc* amendment can have retroactive effect in "order to correct a clear mistake and prevent injustice, but not to alter the … original purpose." *Nunc Pro Tunc Amendment*, BLACK'S LAW DICTIONARY (10th ed. 2014). But for an amendment to take effect, there must be a contract to amend. Here, the contract ended automatically four years ago. The parties may now want the contract to have said something other than it did. But the parties' opinion four years after automatic termination does not matter to an unambiguous automatic termination clause. *Cf. Uniloc USA, Inc. v. Motorola Mobility, LLC*, 2020 WL 7771219 (D. Del. Dec. 30, 2020). So once again, TexasLDPC's attempted cure does not resolve the issue.

True, *nunc pro tunc* agreements can remedy limited deficiencies in justiciability by expanding previously limited patent rights. *See, e.g.*, *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998) (letting a *nunc pro tunc* agreement cure an incapacity to sue for past infringement when the plaintiff already had standing to sue for current and future infringement). But these agreements cannot cure a complete lack of standing or eliminate a need to join patent owners. *See Alps S., LLC v. Ohio Willow Wood Co.*, 787 F.3d 1379, 1384–85 (Fed. Cir. 2015.

Plus, under Texas law, not even the court sitting in equity can reform a contract unless there is mutual mistake at the time of the contract. *See Wallerstein v. Spirt*, 8 S.W.3d 774, 781 (Tex. Ct. App. 1999); *accord Nat'l Austl. Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006). There is none here. And even if this amendment could have changed the contract while it was alive, *nunc pro tunc* would be a powerful incantation indeed if it could bring back a long-dead contract.

Despite their best efforts, Texas A&M and TexasLDPC cannot resurrect the licensing contract. Without that contract, TexasLDPC no longer has a legal interest. And without the legal interest, there is no surviving case or controversy. So this Court lacks subject-matter jurisdiction. I thus dismiss all of TexasLDPC's claims without prejudice. *See* FED. R. CIV. P. 41(b).

### III. TEXAS A&M IS A NECESSARY PARTY

Even if this Court had subject-matter jurisdiction, I would still dismiss TexasLDPC's claims for failing to join a necessary party. Indeed, while trying to escape the 12(b)(1) issue, TexasLDPC has sailed headlong into 12(b)(7).

Previously, I declined to decide whether Texas A&M was a necessary party under Rule 19(a). D.I. 148, at 4. At the time, I saw no reason not to continue under 19(b). But now, it is taking part in this case selectively. And Broadcom has pointed out compelling issues in determining the remedy. Because Texas A&M has shown a clear interest in the case and its absence undermines the Court's capacity to give complete relief to the Plaintiff, I hold that it is a necessary party.

1. *Texas A&M is interested in this case and is required for complete relief.* Under Rule 19(a)(1)(B), a party is required if its absence may "impair or impede" the present parties' ability to protect the interest of the absent party. FED. R. CIV. P. 19(a)(1)(B)(i). The absent party's interests are clear. Texas A&M has significant financial and legal interests as the patent owner, as well as specific knowledge required to assign damages. If TexasLDPC were to win a judgment, Texas A&M would presumably still receive 35% of the payout. D.I. 529-1, at 114 § 3.03. This financial interest is persuasive but not dispositive. Plenty of nonparties can receive a share of payouts without being joined.

But Texas A&M has shown that its absence limits its capacity to defend its interests. Texas A&M has parachuted into this suit to resurrect a dead contract in a novel way. It insists on its sovereign immunity, but then sticks its neck out to try to salvage a defunct document. This attempt to control the Court's reading of the contract

15

suggests that its interest in the case is strong enough that it should be part of the case. Without being joined, Texas A&M cannot protect its interest as effectively. *See* FED. R. CIV. P. 19(a)(1)(B)(i). Why else would it break its self-imposed silence to execute a new agreement? Plus, by involving itself so intimately in this suit, Texas A&M has strengthened the argument that TexasLDPC never had all the substantial rights needed to sue on its own.

Turning to the intellectual-property-specific issues, licensees may not proceed without the patent owner unless they hold an exclusive license with all substantial rights. *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264–65 (Fed. Cir. 2010). The license does not have to use those exact words to conjure up the necessary relationship. Capacity to both sue and license without restriction usually suffices. But a licensee—even one with an exclusive license—does not have all substantial rights if the patent owner restricts the licensee's capacity to sue or requires it to involve the owner in suits. *Compare Abbott Lab'ys v. Diamedix Corp.*, 47 F.3d 1128 (Fed. Cir. 1995), *with Mars, Inc. v. Coin Acceptors*, 527 F.3d 1359 (Fed. Cir. 2008).

Even before the contract ended, it conveyed incomplete rights in a few ways. First, it barred suit against a prior licensee. D.I. 529-1, at 112–13 § 2.01. Second, the license reserved to Texas A&M the exclusive right to enforce that prior license. *Id.*; *accord* D.I. 529-1, at 572–73. Third, the license reserved Texas A&M's development rights. *Id.* Though none of these reservations is fatal to the conveyance of all substantial rights on its own, the three together suggest that Texas A&M conveyed more limited

16

exclusionary rights. *See Diamond Coating Techs., LLC v. Hyundai Motor Am.*, 823 F.3d 615, 620–21 (2016).

In addition, a party is necessary if the court cannot "accord complete relief" in the party's absence. FED. R. CIV. P. 19(a)(1)(A). The theory of damages that TexasLDPC asks us to use—the *Georgia-Pacific* test—requires, in part, licensing information from the party that would have licensed the intellectual property at the time of the breach. *See Ga.-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Texas A&M would have been the licensing body at the time of the breach. So to afford appropriate relief, the Court needs extensive information from Texas A&M. *See* Cleve B. Tyler & Gregory E. Smith, Calculating Intellectual Property Damages §§ 5.31–46 (2022) (walking through the *Georgia-Pacific* Factors).

In some cases, the Court could construe facts against the absent party to avoid dismissal. But here, that approach would require us to construe half of the factors. If Texas A&M refuses to take part in this case except when it suits its fancy, the Court cannot provide adequate and properly calculated relief.

A vague promise from TexasLDPC that Texas A&M would cooperate at that stage is no answer. State sovereign immunity is a shield for the states to avoid unwanted suits; it is neither a sword to hack evidence out of the court's record nor a hammer to craft the outcome of a case to the sovereign's liking. *Bd. of Regents of the Univ. of Tex. Sys. v. Bos. Sci. Corp.*, 936 F.3d 1365, 1370 (Fed. Cir. 2019). Texas A&M is necessary to provide appropriate relief and has proven that its interest cannot be maintained without it. It must be joined.

2. *Defendants would be prejudiced by Texas A&M's absence.* When a necessary party cannot be joined, the Court can proceed without the party if "equity and good conscience" allow it. FED. R. CIV. P. 19(b). Though TexasLDPC insists that the Court has come too far and should press on without Texas A&M, the sunk cost argument is a fallacy here. The biggest cost to the Court is yet to come in the form of a trial. All necessary parties must be joined before the case goes to trial. And judicial economy does not excuse bringing the wrong parties through the door.

"Whether a suit can proceed without an absent, required party" depends on "regional circuit law." *Gensetix*, 966 F.3d at 1324. The Third Circuit has recently emphasized that, like a court in equity, this Court must consider a sovereign party's absence case by case. *See Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, 80 F.4th 223 (3d Cir. 2023). If a party is necessary to the case, and there is no way to add the party, I must carefully balance the interests in 19(b). If the factors weigh against continuing without the absent sovereign, I must dismiss the case under 12(b)(7). *See Republic of the Philippines v. Pimentel*, 553 U.S. 851, 867 (2008) ("[W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign."). Here, the 19(b) factors weigh against continuing without Texas A&M.

First, Texas A&M refused to answer the last round of discovery requests from Broadcom; it asserted its sovereign immunity. D.I. 529, at 16–18. It then turned around to help TexasLDPC interpret its contract against its plain language. By

extending a lifeline to TexasLDPC while actively refusing to answer requests from Broadcom, Texas A&M prejudices Defendants in a way that cannot be cured without joinder. *See* FED. R. CIV. P. 19(b)(1). As Broadcom points out, even the convenient appearance of the new agreement at this stage creates discovery issues. Broadcom should be able to learn more about the provenance of the agreement—at least to ensure its validity—but cannot. D.I. 643, at 4–5. Continuing without Texas A&M would be inequitable.

Second, the *Georgia-Pacific* test would prevent me from granting adequate relief absent Texas A&M. *See* FED. R. CIV. P. 19(b)(3). I could shape the relief by construing matters against Texas A&M. But such a maneuver under 19(b)(2)(B) would prejudice the absent party under 19(b)(1). The Supreme Court has made it clear that prejudicing the absent sovereign must be avoided. *Pimentel*, 553 U.S. at 867.

Finally, the plaintiff has an adequate remedy for our dismissal: it could negotiate a license with Broadcom or refile this case with Texas A&M. *See* FED. R. CIV. P. 19(B)(4). If Texas A&M still refuses to join, it could renegotiate a contract that conveys all substantial rights to TexasLDPC. As I do not rule on the merits here, there is no res judicata bar on filing a parallel suit. *Elkadrawy v. Vanguard Grp., Inc.*, 584 F.3d 169, 172 (3d Cir. 2009); *accord Gillig v. Nike, Inc.*, 602 F.3d 1354, 1361 (Fed. Cir. 2010).

The parties agree that all claims TexasLDPC brought are founded on the contract and the intellectual property rights conveyed in that contract. D.I. 626, at 5; D.I. 627, at 2–3. Thus, for all claims, Texas A&M must be a party to the suit. So even if this

Court had subject-matter jurisdiction, I would still dismiss all of TexasLDPC's claims without prejudice for failure to join a necessary party.

## IV. DEFENDANTS' STATE COUNTERCLAIMS MAY SURVIVE

Broadcom asks that I preserve three categories of counterclaims: (1) federal counterclaims for non-infringement, invalidity, and unenforceability of the asserted intellectual property; (2) attorneys' fees under § 285 of the Patent Act; and (3) state-law claims for inducement of breach of contract and intentional interference with contract.

To make this motion, Broadcom effectively waived its federal claims by arguing that TexasLDPC no longer has any property interest in the intellectual property. Because I agree, Broadcom's federal claims must be dismissed. Plus, without other claims, Broadcom's request for attorneys' fees cannot establish federal question jurisdiction "because those awards are merely a 'byproduct' of a suit that already succeeded, not a form of redressability." *Uzuegbunam*, 141 S.Ct. at 801 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)).

Broadcom's last two counterclaims are state-law claims based on supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). To stand alone, they would need to rely on diversity jurisdiction, which requires complete diversity. § 1332(a). Defendants are incorporated in Delaware, and their principal place of business is California. *See* D.I. 375, at 60. TexasLDPC is a Texas corporation, and it claims that its principal place of business is in Texas. D.I. 375, at 60; D.I. 377, at 2. So it seems that there is diversity jurisdiction to maintain this suit in federal court.

But Yarlagadda was the only employee of TexasLDPC when Broadcom filed the counterclaims. The Court knows that she has been living in India for some time and sold a house in California to move there. Given this question about TexasLDPC's nerve center, and since the counterclaims were not originally brought on diversity jurisdiction, I request letter briefing on whether the parties were in fact diverse at the time of Broadcom's counterclaims.

I dismiss all counterclaims except the two state counterclaims and attorney's fees without prejudice. If letter briefing shows diversity, Broadcom and friends may maintain these claims with the expectation that they will voluntarily dismiss them, as they stipulated that they would, at the end of discovery. D.I. 627, at 2. I dismiss all pending motions as moot.